## AFFIDAVIT

Michael J. Carazza, Special Agent, Federal Bureau of Investigation, being duly sworn, states:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed for over twenty-one years. I am currently assigned to the Public Corruption Squad. I have been assigned to the Public Corruption Squad for approximately eight years, and have also worked and investigated public corruption matters throughout my career. I have also investigated white collar crime, fugitive, and violent crime matters. In my current assignment, I have been involved in the investigation of public corruption offenses which are violations of federal statutes within the jurisdiction of the FBI. I personally participated in the investigation of violations of federal law by JOHN ANALETTO ("ANALETTO") and others during the course of this investigation.

2. During my tenure with the FBI, I have been involved in dozens of investigations. I have debriefed defendants, informants, and witnesses. I have conducted surveillance, worked with confidential

informants, and participated in investigations using court-authorized interception of wire and electronic communications. During my law enforcement career, I have also participated in the preparation and execution of numerous arrest warrants and search warrants.

3. This affidavit is submitted in support of a criminal complaint charging ANALETTO with collection of extensions of credit by extortionate means in violation of Title 18, United States Code, Section 894 (a).

4. This affidavit is being submitted for the limited purpose of establishing probable cause to believe that ANALETTO violated 18 U.S.C. § 894(a). I have included only those facts I believe to be necessary to make this showing. This affidavit does not include each and every fact known to me concerning this investigation. The foregoing facts are based on my personal participation in this investigation, including but not limited to, first-hand observations of ANALETTO, as well as my conversations with other federal and state law enforcement officers. A substantial part of the evidence in support of this affidavit is based on consensual surreptitious recordings.

5. On December 19, 2011, a confidential witness ("CW") met with me. CW indicated that CW has been involved in illegal interstate gambling businesses for approximately seventeen years. During the past year, CW was introduced to ANALETTO, a Massachusetts State Trooper, through a mutual friend, and thereafter ANALETTO became a bettor with CW. ANALETTO learned of CW's outstanding debts to loansharks and offered to loan CW money for some of these debts in exchange for a percentage of CW's gambling business. Initially, and on or about the week ending September 25, 2011, ANALETTO loaned CW $11,000 for these purposes. Subsequently, and on or about the week ending October 30, 2011, ANALETTO loaned CI an additional $13,000 for these same purposes. In making the initial loan to CW, ANALETTO threatened to "kill" CW if he/she did anything to affect ANALETTO's pension. ANALETTO also agreed to bring bettors to CW's business, and in exchange demanded a higher percentage from CW. To date, ANALETTO has brought five bettors to CW.

6. ANALETTO initially established repayment terms for the $24,000 he loaned CW as follows: $500 principal return per week, plus weekly interest return on CW's gambling business profits. Initially,

ANALETTO set the interest rate regarding the profits at approximately 10% weekly, then raised it to 15% weekly, and more recently, lowered the rate to 12.5% weekly. Irrespective of the time required to pay off the loan(s), ANALETTO demanded a percentage of CW's gambling business profits for the duration of CW's life.

7. On December 23, 2011, ANALETTO met with CW in Belmont and accepted $1,500 from CW in exchange for loan amounts due by CW and gambling profits owed to ANALETTO. ANALETTO and CW discussed certain business matters and amounts owed by CW to ANALETTO. During the meeting, ANALETTO became angry at CW regarding the amount of monies still owed by CW to ANALETTO. During these discussions, ANALETTO stated to CW, "Will I kill you? Ya, I'll fucking kill you." The interaction between the CW and ANALETTO was memorialized on film through the use of a concealed audio and video recording device placed on the CW's person by the FBI. I have personally reviewed this recording.

8. On December 26, 2011, CW spoke on the telephone with ANALETTO regarding monies owed to him (ANALETTO). In discussing a particular bettor who owed CW money, ANALETTO made statements

to CW that he (ANALETTO) would break into the individual's house and physically harm the bettor and sexually assault bettor's mother. ANALETTO then got angry with CW and again threatened to kill CW, stating in words or substance that he would buy a ski mask, break into CW's house during the night and kill CW in his/her sleep and that there would be no witnesses.

9. On December 30, 2011, ANALETTO met with CW at a pre-arranged location in Belmont. CW was furnished $3,600 by the FBI to provide to ANALETTO. During the meeting, ANALETTO became physically violent with CW, head butting him/her and then slapping CW's face. ANALETTO also talked about causing harm to bettors who owe CW money. During that same meeting, ANALETTO demanded the telephone number of bettor (unsub aka "Chris"). ANALETTO told CW that CW needed to travel to "Chris's" house to collect the money. ANALETTO also told CW that he (ANALETTO) has a friend that has been arrested three times for gambling, bookmaking, and racketeering and that he has not spent one day in jail. ANALETTO then stated in sum and substance regarding "Chris":

(A) It's "fucking bullshit."

(B) The FBI is worried about organized crime? No, they're worried about terrorist activities.

(C) This is gambling. This is bullshit.

(D) You have to do something. Put some black pants on. Go to his house and slash all the tires on his car.

(E) ANALETTO offers to go with CW.

(F) ANALETTO asks CW for "Chris's" telephone number.

(G) I am gonna call with an untraceable Walmart phone. I am gonna call with the unblocked number. I'm gonna leave a message.

ANALETTO then placed a telephone call to what is believed to be "Chris's" telephone number and left a message stating in sum and substance:

(A) Hi Chris, Happy New Year.

(B) We're calling to see if we can recoup some of our investment.

(C) You owe "38", we'll round it to four with interest.

(D) We'd appreciate if you contact the right people and start doing the right thing. Or 2012 isn't gonna be too good for you.

(E) So Happy New Year to you and your mom and dad and family.

    (F) We appreciate the consideration.

    (G) Make the call. We hope to hear from you by the by the 1st of 2012.

    (H) Capice. Bye.

ANALETTO also told CW "Whether you pay me or not over the life of the loan, but after five years and three months, when I retire, I'm coming for you for my money, if you're still alive." At one point during the meeting, ANALETTO told CW that he (ANALETTO) won't hurt or kill CW, or anyone, and that he just wants his (ANALETTO's) money. However, ANALETTO made this statement in a threatening tone and continued to speak with the CW in a threatening manner for the remainder of the conversation. This interaction between the CW and ANALETTO described in this paragraph was also memorialized on film through the use of a concealed audio and video recording device previously installed on CW's person by the FBI. Based on my training and experience as a law enforcement officer, as well as my review of this recording, I believe that the threats made by ANALETTO are significant. Further the CW continues to convey to me that CW fears for his/her life.

10. Based on the information set forth above, I believe probable cause exists to conclude that on or about December 26 and 30, 2011, ANALETTO violated 18 U.S.C. § 894 (a).

_____
Michael I. Carazza
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 31st day of December 2011.

_____
Marianne B. Bowler
United States Magistrate Judge